IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WAYNE S. GAYLE                  :      CIVIL ACTION
                                :
        v.                      :
                                :
CONRAD LAMONT, et al.           :      NO. 09-1290


MEMORANDUM

McLaughlin, J.                              January 9, 2013

        This § 1983 suit arises out of alleged constitutional
deprivations experienced by the inmate plaintiff during his
incarceration at Northampton County Prison ("NCP").  In his
Second Amended Complaint ("SAC"), the plaintiff, Wayne S. Gayle,
brings the following claims against NCP staff members Lieutenant
Conrad Lamont, Correctional Officer Jason Miller, and
Correctional Officer Paul Ritter: (1) use of excessive force in
violation of the Eighth Amendment; (2) inadequate medical care in
violation of the Eighth Amendment; and (3) unlawful retaliation
for constitutionally protected activity.  Gayle also alleges that
the above-named defendants and Director of Corrections Robert
Meyers, who formerly held the position of deputy warden at NCP,
violated Gayle's right to free exercise of religion under the
First Amendment.  The defendants move for summary judgment on all
claims under Rule 56 of the Federal Rules of Civil Procedure.

        The Court will grant the defendants' motion with
respect to (1) the First Amendment count against all defendants;
(2) the retaliation count against Lamont, Miller, and Ritter; and

(3) the remaining Eighth Amendment claims against Ritter.  The Court will deny the motion as to the Eighth Amendment claims against Lamont and Miller.


I.   Summary Judgment Record

          The facts described herein are undisputed unless otherwise noted.  Inferences are drawn in the light most favorable to Gayle, the non-moving party.  Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009).


     A.   Plaintiff's Religious Dietary Restrictions

          Gayle has been an inmate at NCP on multiple occasions since 1996, including from January 2008 until November 19, 2008, at which point he was transferred to another facility.  The transfer was temporary, and, on March 4, 2009, Gayle was returned to NCP.  PX A (7/6/96 NCP Booking Card); PX E (Inmate Booking Sheet for Wayne Silvera Gayle) at 1.[1]

          Gayle is a practicing Rastafarian and has been since at least the age of 17.  He was born in Jamaica and views Rastafarianism as "a trait of [his birth] country."  As part of his religious observance, Gayle follows a vegetarian diet.  As early as March 1, 2000, Gayle notified prison officials at NCP

---

          [1] "PX" refers to the plaintiff's exhibits, and "DX" refers to the defendants' exhibits.

that he requires vegetarian meals in accordance with his Rastafarian beliefs.  Gayle reiterated his need for a vegetarian diet upon reentry to NCP on August 19, 2005 and in a formal request submitted to prison staff on September 20, 2005.  PX B (11/14/11 Gayle Dep.) at 45; DX D (12/15/09 Gayle Dep.) at 44; PX C (3/1/00 Inmate Request Slip); PX D (8/19/05 Booking Observation Questions); DX J (9/20/05 Dep't of Corr. Request/Grievance Slip).

      At various points during his incarceration, however, Gayle has received meals containing meat products inconsistent with his religious practice.  Gayle notes that obtaining a vegetarian diet at NCP is an "ongoing problem" and that, as recently as October 2008, he was provided meal trays containing fish.  On several occasions, Gayle complained orally and in written grievances to various prison officials about being served non-vegetarian meals in violation of his religious beliefs and requesting that he receive a vegetarian diet.  Gayle has also objected to his meals on secular grounds.  He has complained to NCP staff about the types of vegetarian foods served to him and about his meal portions.  DX D at 45-46; PX B at 49; DX K (10/2/08 Dep't of Corr. Request/Grievance Slip) at 2; DX G (12/19/11 Ritter Dep.) at 87; PX S (4/22/09 Incident Report).

      As part of their duties, Correctional Officers Miller and Ritter personally delivered meals to Gayle.  They were aware

-3-

that Gayle had Rastafarian dietary restrictions but, to this day, do not know what those restrictions entail.  DX I (12/2/11 Miller Dep.) at 62-63, 69-70, 187; DX G at 83, 93, 181-82.  Miller recalls Gayle frequently objecting to the contents of his meals for religious reasons.  On each such occasion, Miller would contact kitchen staff and request a proper meal for Gayle or ask his supervisor to intervene with Aramark, the prison's food services provider.  Despite these efforts, the kitchen did not always provide Gayle with a replacement meal that complied with his Rastafarian beliefs.  DX I at 60-62, 72-75.  Ritter does not remember Gayle ever objecting to his meals due to his Rastafarian dietary needs.  He recalls Gayle complaining about meals because "[t]he portions were too small" or because Gayle's tray was missing one of the meal components.  DX G at 86-91.

On one occasion prior to October 16, 2008, Lieutenant Lamont was informed by a correctional officer that Gayle had been served a meal inconsistent with his religious beliefs.  In response, Lamont "went down to the kitchen and asked the supervisor to prepare [Gayle] something else and bring it up to him."  Lamont was otherwise unaware of what food Gayle received, although he knew the prison chaplain was working with Gayle to design an appropriate meal plan.  DX F (12/2/11 Lamont Dep.) at 27-30, 106-07.

On October 13, 2008, while in his former position of

-4-

NCP deputy warden, Meyers issued a memorandum responding to one of Gayle's grievances, which objected to, among other things, the presence of meat on his meal trays.  Meyers' memorandum stated that Gayle would be provided with a modified, vegan diet.  DX L (10/13/08 Memorandum).  Gayle continued to experience problems with his food even after Meyers approved the new dietary plan, and, on November 16, 2008, filed a § 1983 complaint against James Buckly, the dietary supervisor at NCP.  The complaint alleged that Buckly had provided Gayle with meals that did not comport with his Rastafarian dietary restrictions and had failed to implement the diet set forth in Meyers' October 13 memorandum.[2] Compl. IV, <u>Gayle v. Buckly</u>, No. 09-2128 (E.D. Pa.) (Docket No. 3).

B.     October 16, 2008 Incident and Gayle's Requests for
       Treatment

       On October 16, 2008, Lamont was conducting a routine inspection of the tier on which Gayle's cell was located and observed a prison jumpsuit hanging in Gayle's cell.  The jumpsuit was spread across the bars facing the hallway, partially obscuring the view into the cell.  Gayle had hung the uniform to

_____

[2] The complaint, which was filed in this court on May 22, 2009, was dismissed for failure to state a claim because it did not allege that Buckly had acted under color of state law.  <u>Gayle v. Buckly</u>, No. 09-2128 (E.D. Pa. Jan. 6, 2010) (Docket No. 10).

provide himself with privacy and block the light from the hallway while he tried to sleep.  DX F at 35-36, 39-40; DX D at 77-78.

Lamont directed Gayle to take down the jumpsuit and Gayle complied with the order.  Noting that he believed Lamont to be a fellow Jamaican and that Lamont presumably knew "what a Rastafarian diet should be," Gayle asked Lamont if he could help procure him a vegetarian diet in accordance with his religious practices.  At that point, Lamont left Gayle's cell and returned with Officers Miller and Ritter and possibly other NCP officers. An altercation ensued, during which Ritter sprayed Gayle in the face with oleoresin capsicum, i.e., pepper spray, and Gayle was taken to the floor by the officers.[3]  DX D at 80-82, 85-90, 104-05; DX F at 46; DX E (10/16/08 Report of Extraordinary Occurrence).

Following the incident, Lamont, Miller, and Ritter placed Gayle in a different cell on the tier, seating him on the cell's bed.  A nurse on the prison's medical staff came to the tier to examine Gayle.  The nurse tested Gayle's blood pressure but did not examine or treat him for any other injuries.  At some point after the altercation, Lamont, Miller, and Ritter also brought Gayle to the showers to wash off the pepper spray.  While

---

[3] Other details of the oral exchange and resulting physical altercation between Gayle and the NCP officers, including the reason for the officers' use of force, are in dispute.  See Def'ts' Br. at 17 n.5; Pl.'s Opp. at 7-8.

he was being taken to the showers, Gayle complained to the officers of pain in his lower back and asked to see the prison's medical staff.[4]   DX D at 93-95, 107-08.

After being decontaminated in the showers and examined by a prison nurse, Gayle was returned to his cell.  After sitting on his bed for approximately an hour, Gayle attempted to get up to urinate, experienced "vicious[]" pain in his lower back, and fell to the ground.  While lying on the ground, Gayle repeatedly asked Miller, who was stationed on the tier, to notify medical personnel that he required treatment.  Id. at 95.  That day, Gayle also submitted an official form requesting medical treatment for "excruiciating [sic] pain coming from [his] lower back and spinal area."  PX N (10/16/08 Sick Call/Medical Request).

In response to Gayle's oral requests, Miller called the prison's medical department multiple times on October 16.  In addition, Miller relayed Gayle's requests for medical care to the supervising lieutenant on duty.  At no point that day did the

---

[4] The relative timing of the nurse's examination and Gayle's decontamination is disputed.  Gayle claims that the nurse came to take his blood pressure before he was brought to the showers. According to Gayle, at that point, he had been placed on a bed but had not yet tried to move under his own power and, consequently, had not yet felt or complained of any back pain. It was only when Gayle later attempted to move toward the shower that he experienced pain in his lower back and requested medical treatment for a possible back injury.  DX D at 107.   Lamont and Miller, on the other hand, testified at deposition that the nurse examined Gayle after he had been decontaminated in the showers and returned to a cell on the tier.  DX F at 66; DX I at 154-55.

medical staff request Gayle's transfer to their unit for treatment.  Miller informed Gayle that he had called the medical department but that the medical personnel would not see Gayle. Miller also told Gayle that he had spoken to Lieutenant Lamont and that Lamont refused to come to Gayle's cell to address Gayle's claimed need for treatment.  Other than the blood pressure test administered by the prison nurse, Gayle did not receive any medical treatment or further examination on October 16.  DX I at 158, 160-63; DX D at 94-95.

At some point that day, Miller passed by Gayle's cell while Gayle was lying on the floor and resting his head on the metal bars of the cell door.  When Gayle reasserted his request that Miller contact the medical department, Miller responded by kicking the metal gate on which Gayle was resting his head. Miller also stated that he had already called the prison's medical staff, that the medical team was not responding, and that he would not make any further calls on Gayle's behalf.  DX D at 99-100.

Because Gayle's back pain prevented him from standing, Gayle reached up to his bed, dragged his mattress to the ground, and spent the rest of the day and night of October 16 on the floor of his cell.  Gayle lay on the ground for at least portions of the next three days, and was unable to bathe during that

period.[5]  Id. at 95-96.

On the evening of Sunday, October 19, 2008, Gayle attempted to move from the floor to a standing position by grabbing onto the bars of his cell and pulling himself up.  As Gayle did so, his back pain returned and he fell to the ground, landing in the hallway outside his cell.  Correctional Officer Chad Rinker heard Gayle fall into the hallway and subsequently yell that his back was hurting.  Officer Rinker called the medical staff to the floor, and Gayle was transferred to the medical unit.  Id. at 96-97; PX Q (10/19/08 Incident Report).  Gayle received treatment and was diagnosed by the medical staff as having "back pain secondary to trauma."  PX R (Wayne Silvera Gayle Medical Chart).  Gayle spent approximately two weeks in the medical unit, during which he was placed in a wheelchair.  DX D at 98.

Following the October 16 incident, Gayle obtained and stored in his cell three or four eyewitness statements from inmates who observed the altercation.  On November 7, 2008, Gayle filed a grievance, alleging that Miller had gone into his cell

---

[5] Gayle alleges that he remained on the ground from Thursday, October 16, until the late part of Sunday, October 19, unable to stand.  DX D at 95-96.  Other evidence in the record contradicts Gayle's assertion that he was non-ambulatory for that entire period.  On October 17, 2008, Miller filed an incident report, noting that, although Gayle was then claiming that he could not walk or stand, Miller had observed Gayle standing in the front of his cell yelling at other inmates.  PX P (10/17/08 Incident Report).

while he was in the medical unit and had taken items, including "two documents of legal work." In his grievance, Gayle expressed fear that he was being "set up" by NCP officers and that his physical safety was in jeopardy. He requested transfer to a different prison until certain, unspecified "affairs" at NCP were resolved. PX K (11/7/08 Dep't of Corr. Request/Grievance Slip). Gayle was thereafter transferred to another correctional facility on November 19, 2008.

Sometime after his transfer, Gayle asked his brother to collect his personal belongings still in the possession of NCP. His brother retrieved, among other things, a plastic bag containing the personal paperwork that Gayle had kept in his cell. The written witness statements concerning the October 16 altercation were not in the bag. PX B at 24-31.

C.   Procedural Background

Gayle filed his original complaint in this action pro se on April 1, 2009, alleging that Lamont and Miller violated his Eighth Amendment right to be free of cruel and unusual punishment. Compl. IV. The complaint stated that Lamont and Miller had used excessive force in connection with the October 16, 2008 incident and ignored Gayle's ensuing requests for medical treatment for his back pain. Id. After appointment of counsel by the Court, Gayle filed a first amended complaint

("FAC") on April 22, 2011, in which he added a retaliation claim against Lamont and Miller.  Gayle thereafter filed the SAC on January 23, 2012.  The SAC included Ritter as a defendant on Gayle's Eighth Amendment claims and the retaliation count.  The SAC also added a claim of First Amendment free exercise infringement against Lamont, Miller, Ritter, and newly named defendant Robert Meyers.

II.  <u>Analysis</u>[6]

        The defendants argue that Gayle's claims are time-barred and that he failed to exhaust his administrative remedies prior to bringing suit.  The Court finds that all of Gayle's claims, except for the Eighth Amendment claims against Lamont and Miller, are untimely and will grant summary judgment in favor of the defendants on the time-barred claims.  The Court cannot grant summary judgment for the defendants on the remaining Eighth Amendment claims, however.  Genuine issues of material fact exist with respect to both Gayle's exhaustion of prison grievance

        [6] Summary judgment is appropriate if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The Court must consider the evidence in the light most favorable to the non-moving party.  Once a properly supported motion for summary judgment is made, the burden of production shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

procedures and the merits of those claims.

    A.   <u>Timeliness of Gayle's Claims</u>

      The defendants contend, and the Court agrees, that the claims first raised in Gayle's amended complaints are untimely. These include (1) the claim of retaliation against Lamont and Miller, which was asserted in the FAC, filed on April 22, 2011; (2) the First Amendment free exercise claim against all four defendants, raised in the SAC, filed on January 23, 2012; and (3) all other claims against Ritter, who was added as a defendant in the SAC.  Gayle counters that the statute of limitations should not bar any of his claims.  He first argues that his First Amendment and retaliation claims are based on a continuous pattern of conduct by the defendants that lasted at least into 2009 and that those claims were timely raised before the Court. Gayle next asserts that, even if his amended pleadings were filed outside any applicable limitations period, the claims asserted therein are timely because the statute of limitations should be tolled from April 14, 2010 until March 18, 2011, while the case was placed in civil suspense.  Lastly, Gayle argues that his First Amendment claim and claims against Ritter relate back to the original complaint filed on April 1, 2009.[7]  The Court finds

---

[7] Gayle has not argued that his retaliation claim against Lamont and Miller, first raised in the FAC, may, if time-barred, also be salvaged through relation back to the original pleading.

that Gayle's proffered theories do not save these claims.

      1.   Applicable Statute of Limitations and Accrual of Gayle's Claims

      Section 1983 claims are subject to state statutes of limitations governing personal injury actions.  Garvin v. City of Phila., 354 F.3d 215, 220 (3d Cir. 2003) (citing Owens v. Okure, 488 U.S. 235, 249-50 (1989)).  The Pennsylvania statute of limitations applicable here is two years.  Id. (citing 42 Pa. Cons. Stat. § 5524(7)).  Although Pennsylvania law provides the limitations period, federal law controls when Gayle's § 1983 claims accrued.  Wallace v. Kato, 549 U.S. 384, 388 (2007). Accrual occurs "when the plaintiff knows or has reason to know of the injury which is the basis of the section 1983 action."  Genty v. Resolution Trust Corp., 937 F.2d 899, 919 (3d Cir. 1991); see also Kach v. Hose, 589 F.3d 626, 634 (3d Cir. 2009).  Because a defense based on the statute of limitations is an affirmative defense, it is the defendant's burden to demonstrate that a claim is untimely.  In re Cmty. Bank of N. Va., 622 F.3d 275, 292 (3d Cir. 2010).

      Gayle's Eighth Amendment claims against Ritter arise from the October 16, 2008 altercation in Gayle's cell and the fact that Gayle did not receive treatment for back pain related to that incident until three days later, on October 19.  The

-13-

statute of limitations on these claims ran in October 2010. Because Gayle first named Ritter as a defendant in the SAC, filed over a year and three months after the termination of the limitations period, his Eighth Amendment claims against Ritter are untimely.

Gayle's retaliation claim against Lamont, Miller, and Ritter, as pled in the SAC, is similarly based on the events of October 16 to 19, as well as Gayle's allegation that these defendants destroyed inmate declarations regarding the October 16 altercation that would have aided Gayle's claims in the present case.  Gayle became aware that some of his legal paperwork was missing while he was incarcerated at another facility between November 19, 2008 and March 4, 2009.  Accordingly, the latest possible accrual date for his entire retaliation claim is March 4, 2009.  The two-year statute of limitations on that claim had run by the time Gayle added a retaliation claim against Lamont and Miller in the FAC, filed in April 2011, and against Ritter in the SAC, filed in January 2012.

The precise date of accrual on Gayle's First Amendment claim, which is premised on the defendants' alleged failure to provide Gayle with meals in accordance with his Rastafarian beliefs, is somewhat more difficult to identify from the SAC and the evidentiary record.  Gayle claims that each of the defendants either delivered meals that did not comply with his dietary needs

-14-

or failed to address his religious objections to his food, although he has not specified when each allegedly unconstitutional action took place.  In his opposition to the defendants' motion for summary judgment, Gayle argues that the defendants engaged in a "constant denial" of his First Amendment rights lasting at least until August 2009.  Pl.'s Opp. at 13.

Contrary to the argument pressed by Gayle in his briefing, the SAC makes plain that Gayle's First Amendment claim against the defendants is based on actions that took place prior to his transfer from NCP on November 19, 2008.  The very first factual allegation in the SAC states that Gayle was an inmate at NCP "[f]rom January to November 2008."  SAC ¶ 9.  The SAC makes no mention of the fact that Gayle was transferred back to that institution in March 2009 or at any other point, and does not allege that Gayle's First Amendment rights were abridged during subsequent (or even preceding) periods of incarceration.  Indeed, all incidents of purportedly unconstitutional meal provision explicitly referenced in the SAC took place in 2008.  See id. ¶¶ 15-25.  The SAC, fairly construed, limits its scope to constitutional violations alleged to have occurred in that year.[8]

---

[8] Gayle now appears to argue that his retaliation claim is similarly premised on actions taken by NCP staff as recently as August 2009.  See Pl.'s Opp. at 12-13.  This argument is likewise belied by the fact that the allegations of retaliation in the SAC all refer to conduct that took place while Gayle was an inmate at NCP from January to November 2008 or during his temporary transfer to another facility.  See SAC ¶¶ 78-86.

-15-

The defendants are, therefore, correct in arguing that the latest date for accrual of Gayle's First Amendment claim is November 19, 2008.  That would mean that the statute of limitations on Gayle's First Amendment claim ran in November 2010 and that it was untimely included in the SAC.

The summary judgment record bolsters the Court's reading of the SAC.  Gayle proffers two pieces of evidence to demonstrate a continual violation of his religious beliefs after his return to NCP in 2009.  Neither implicates the defendants. Gayle testified at his 2009 deposition that lack of a vegetarian diet has been an "ongoing problem" at NCP, but he did not state that Lamont, Miller, Ritter, or Meyers was responsible for that "ongoing problem."  DX D at 46.  Gayle also cites an April 22, 2009 incident report, which notes that he refused the dinner served to him on that evening.  PX S.  The report reflects, however, that Gayle's meal refusal was based on the fact that he was being served beans for the second meal in a row, not that he was unable to eat his dinner on religious grounds.  In fact, the Court is not aware that Gayle lodged any religious dietary requests or grievances after 2008.  See PX C (March 1, 2000 request for vegetarian diet); PX D (August 19, 2005 booking instructions listing Gayle's diet as vegetarian); DX J (September 20, 2005 grievance regarding lack of vegetarian meal options); DX K (October 2, 2008 grievance regarding fish on

Gayle's meal trays).

Moreover, evidence particularized to Lamont and Meyers demonstrates that their only involvement in Gayle's meal provision occurred in 2008.  Lamont asserts, and Gayle has not refuted, that he was only one time made aware of Gayle receiving a meal that did not comport with his religious beliefs.  That occurred sometime before the October 16, 2008 altercation.

Gayle's First Amendment claim against Meyers stems from Meyers' October 13, 2008 memorandum issued in response to a grievance filed by Gayle earlier that month, in which Gayle raised religious objections to his food.  Meyers' memorandum authorized a new vegan meal plan for Gayle.  Gayle contends that, even after Meyers approved the new diet, NCP's provision of food violated his religious beliefs.  In fact, on November 16, 2008, Gayle signed and later filed in this court a complaint against James Buckly, the dietary supervisor at NCP, alleging that Buckly was infringing his First Amendment rights by, among other things, failing to carry into effect the diet outlined in Meyers' October 13 memorandum.  This further supports the finding that Gayle was well aware of the basis for a First Amendment claim against the defendants by mid-November 2008 and such claims had at that time accrued, setting the statute of limitations to expire, at the latest, in November 2010.  See Genty, 937 F.2d at 919.

2.   Tolling of Gayle's Claims

Gayle initially filed the instant case pro se.  On April 14, 2010, the Court placed this case in civil suspense pending the appointment of counsel.[9]  Present counsel noticed an appearance on behalf of Gayle on March 7, 2011 and the case was removed from suspense on March 18, 2011.  Gayle urges the Court to toll the two-year statute of limitations on his otherwise untimely claims for the period during which the case was in civil suspense.  Equitable tolling would likely save some, though not all, of Gayle's claims.[10]  That method of circumventing the statute of limitations is, however, not available in the present case.

As a general rule, state tolling principles govern

---

[9] The order placing the case in civil suspense was issued by the late Hon. Thomas M. Golden, U.S. District Court Judge, to whom this action was previously assigned.

[10] Gayle's Eighth Amendment claims against Ritter and his First Amendment claim against all defendants, which accrued in October and November 2008, respectively, were not raised until January 23, 2012, when the SAC was filed.  Even if the statute of limitations was tolled from April 14, 2010 until March 18, 2011, these claims were brought between three and four months after the two-year statute of limitations had lapsed.

As previously mentioned, portions of Gayle's retaliation cause of action accrued as early as October 16, 2008 and the entire claim accrued no later than March 4, 2009.  Tolling the statute of limitations for the roughly eleven months that the case was in civil suspense would render timely the retaliation claim pled against Lamont and Miller in the FAC.  Depending on the accrual date used, tolling might also save at least some elements of the retaliation claim against Ritter, first alleged in the SAC.

§ 1983 claims.  <u>Kach</u>, 589 F.3d at 639 (citing <u>Hardin v. Straub</u>, 490 U.S. 536, 539 (1989)).  That presumptive rule may be reversed and the federal approach to equitable tolling used instead where application of state tolling principles is inconsistent with federal law or policy.  <u>Id.</u>; <u>Lake v. Arnold</u>, 232 F.3d 360, 368-69 (3d Cir. 2000).  "A state statute cannot be considered 'inconsistent' with federal law merely because the statute causes the plaintiff to lose the litigation."  <u>Robertson v. Wegmann</u>, 436 U.S. 584, 593 (1978).  That argument sweeps too broadly, and, if accepted, would work as a one-way ratchet, in this context requiring application of the more permissive jurisdiction's tolling principles in every case.  <u>See</u> <u>Kach</u>, 589 F.3d at 643 (citing <u>Robertson</u>, 436 U.S. at 593).  The state law must, in a more general sense, frustrate the policies underlying § 1983: compensating individuals whose civil rights have been abridged and deterring the abuse of state power.  <u>See</u> <u>Robertson</u>, 436 U.S. at 590-94.  In a slightly different formulation, the federal tolling principle will be applied where it is "'essential to the vindication of federal rights,'" such as when the statute of limitations is tolled to permit exhaustion of procedural prerequisites for initiating a suit.  <u>Kach</u>, 589 F.3d at 643 n.19 (quoting <u>Heck v. Humphrey</u>, 997 F.2d 355, 358 (7th Cir. 1993)) (emphasis omitted).

      Gayle has pointed to no principle of Pennsylvania law

-19-

that would permit the Court to toll the two-year statute of limitations during the time this action was placed in civil suspense.  Nor has the Court's independent analysis of Pennsylvania law yielded a basis on which equitable tolling may be predicated.  Pennsylvania establishes a high bar for invoking the judicially crafted relief of equitable tolling.  Court-ordered modification of a statutory limitations period is prohibited unless a party can show that it was induced to sit on its rights as a result of "fraud or its equivalent."[11]  42 Pa. Cons. Stat. § 5504; <u>Aivazoglou v. Drever Furnaces</u>, 613 A.2d 595, 598 (Pa. Super. Ct. 1992); <u>see also</u> <u>Poole v. Marks</u>, 441 F. App'x 854, 857 (3d Cir. 2011) (per curiam).

There is no suggestion that the Court's decision to place this case in civil suspense was in any way a fraudulent or deceptive attempt to prevent Gayle from asserting additional causes of action.  Placing this action in suspense did not even prevent Gayle from seeking leave to amend his original complaint.  Nor did it preclude him from bringing the claims eventually raised in the FAC or SAC as a separate suit, especially given that Gayle's retaliation and First Amendment claims are based, at

---

[11] One exception to this general bar on tolling by judicial order is the discovery rule, which permits equitable tolling of the limitations period during the time that an injury is undiscoverable through due diligence.  <u>Dalrymple v. Brown</u>, 701 A.2d 164, 167 (Pa. 1997); <u>see also</u> <u>Lyons v. Emerick</u>, 187 F. App'x 219, 221 & n.3 (3d Cir. 2006) (per curiam).  That exception is not relevant here.

least in part, on conduct distinct from that at issue in his original complaint and Ritter and Meyers were not even named as defendants in that initial pleading.  Although unrepresented until March 2011, Gayle was well aware of how to institute federal actions pro se, having initiated three other lawsuits against NCP personnel in November 2008.  See Compl., Gayle v. Buckly, 09-2128 (E.D. Pa.) (Docket No. 3); Compl., Gayle v. Rinker, 09-2129 (E.D. Pa.) (Docket No. 3); Compl., Gayle v. Caputo, 09-2130 (E.D. Pa.) (Docket No. 3).

Gayle also has not argued that general Pennsylvania tolling rules should be displaced due to a conflict with federal law or policy, and the Court does not perceive any such conflict on its own.  The Supreme Court has counseled that a state may reasonably decline to adopt a tolling provision that would aid a class of plaintiffs who are already "willing and able to file § 1983 suits."  Hardin, 490 U.S. at 544.  That is the situation here.  Pennsylvania's decision not to permit tolling during the pendency of a motion for appointment of counsel or while a case is in civil suspense is material only to whether a plaintiff may amend a complaint that has already been filed.  It does not prevent a plaintiff from initiating a § 1983 suit in the first instance and it did not inhibit Gayle's access to a federal forum in this case.  In the absence of a true conflict between Pennsylvania's tolling regime and the policies underlying § 1983,

this Court must apply Pennsylvania tolling principles.  Doing so, the Court cannot equitably toll the statute of limitations on Gayle's accrued, but unpled, claims during the time his case was in civil suspense.

### 3. <u>Relation Back</u>

Gayle also argues that the claims first raised in the SAC are properly before the Court because they relate back to his original complaint.  Federal Rule of Civil Procedure 15(c) permits a party to file an otherwise untimely claim in an amended pleading where the claim relates back to the party's original pleading in the action.  <u>Krupski v. Costa Crociere S.p.A.</u>, 130 S. Ct. 2485, 2489 (2010).  An amendment relates back to the original pleading where "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out–or attempted to be set out–in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  The Court of Appeals for the Third Circuit has recently stated that "the touchstone for relation back is fair notice," and that "only where the opposing party is given 'fair notice of the general fact situation and the legal theory upon which the amending party proceeds' will relation back be allowed."  <u>Glover v. Fed. Deposit Ins. Corp.</u>, 698 F.3d 139, 146 (3d Cir. 2012) (quoting <u>Bensel v. Allied Pilots Ass'n</u>, 387 F.3d 298, 310 (3d Cir. 2004)).

      a.   <u>First Amendment Claim</u>

Gayle's First Amendment claim does not satisfy the test for relation back.  No "common core of operative facts" exists connecting the First Amendment claim with the allegations of Gayle's original complaint, and that initial pleading did not provide the defendants with "fair notice of the general fact situation and legal theory" upon which Gayle's later-pled First Amendment claim was based.  <u>Bensel</u>, 387 F.3d at 310.

The gravamen of Gayle's original complaint is that Lamont and Miller subjected him to "cruel and unusual punishment" in violation of the Eighth Amendment by physically assaulting him on October 16, 2008 and then failing to ensure that he received medical attention before October 19.  Compl. IV.  The free exercise claim is premised on distinct conduct over the course of a different and longer time frame.  The SAC alleges that, over the course of 2008, Gayle "regularly" received non-vegetarian meals he could not eat due to his Rastafarian beliefs and that his "numerous complaints" were unavailing.  SAC ¶¶ 15-16, 24-25.  The SAC also references Gayle's complaint against Buckly, which involved allegations of inadequate meal provision well into November 2008.  <u>See</u> <u>id.</u> ¶ 25.  Gayle ultimately faults the defendants for failing to ensure that his diet comported with his religious practices, failing to address properly his complaints about NCP's accommodation of his Rastafarianism, and denying him

access to a religiously and nutritionally adequate diet.  Id.
¶ 94.  Such "differ[ent] in 'time and type'" claims cannot relate
back under Rule 15(c).  Glover, 698 F.3d at 147 (citing Mayle v.
Felix, 545 U.S. 644, 657-59 (2005); Oja v. U.S. Army Corps of
Eng'rs, 440 F.3d 1122, 1134 (9th Cir. 2006)).  Indeed, the
original complaint does not even state that Miller, Ritter, or
Meyers played any role in the provision of Gayle's meals, let
alone that they violated his constitutional rights with respect
to his diet.

        The original complaint does mention that Lamont had
some awareness of and failed to respond to Gayle's prior
religious dietary requests.  According to the complaint, Gayle
complied with Lamont's directive to remove the hanging jumpsuit
obstructing the view into Gayle's cell; however, Gayle then asked
Lamont why the issue of a hanging uniform was more significant
than his repeated requests for a vegetarian diet, which Lamont
had failed to procure.  That question allegedly sparked Lamont's
ire and caused him to lead other officers in assaulting Gayle.

        The complaint's brief reference to Gayle's prior
dietary issues did not permit Gayle to append and relate back a
free exercise claim in the SAC, even if only against Lamont.  As
the Third Circuit has observed, "factual overlap" between claims
raised in separate pleadings is not sufficient to trigger
relation back.  Id. at 147.  Here, the original complaint notes

                              -24-

only what Gayle said *on October 16* about Lamont's role in the
provision of inadequate meals to explain the genesis of an
allegedly otherwise unprovoked assault by NCP officers.  The
complaint did not provide Lamont with "fair notice" that the
parties would one day litigate the underlying merits of Gayle's
statement or that the statement could be extrapolated into a
claim of unconstitutional conduct over the course of the entire
preceding year.  Id. at 146.

### b.   Other Claims Against Ritter

In addition to permitting the addition of claims, Rule
15(c) allows a party to amend its pleading by changing the
parties against whom claims are brought.  Fed. R. Civ. P.
15(c)(1)(C).  To do so, the amending party must satisfy three
requirements: (1) the claims in the amended complaint must still
arise out of the same "conduct, transaction, or occurrence" set
forth in the original complaint; (2) the added party must have
received notice of the lawsuit within 120 days of its institution
such that he will not be prejudiced by defending against the
claims on the merits; and (3) within 120 days of the suit's
institution, the added party must have known or had reason to
know that the action would have been brought against him, "but
for a mistake concerning [his] identity."  Id.; Arthur v. Maersk,
Inc., 434 F.3d 196, 207 (3d Cir. 2006).

-25-

To the extent any of Gayle's claims against Ritter arise out of the "conduct, transaction, or occurrence" described in the original complaint, they cannot relate back due to lack of notice.  Gayle does not argue that Ritter had actual notice of the instant action within 120 days of its initiation.  Rather, he contends that Ritter was constructively aware of the suit.  See Pl.'s Opp. at 14-15.  The Third Circuit employs two methods to impute constructive notice under Rule 15(c): the shared attorney method and the identity of interest method.  Garvin, 354 F.3d at 222-23; Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 196-98 (3d Cir. 2001).  Under either theory, the newly added defendant must receive notice that a lawsuit has been instituted and not merely notice of the underlying events supporting the cause of action.  Singletary, 266 F.3d at 195.

The shared attorney method requires the Court to determine whether an attorney's later representation of a defendant sought to be named "gives rise to the inference that the attorney, within the 120 day period, had some communication or relationship with, and thus gave notice of the action to, the newly named defendant."  Id. at 196-97; see also Garvin, 354 F.3d at 223.  Notice may be imputed through the identity of interest method where the parties' business operations or other activities are so closely related that the institution of the action against one provides notice of the litigation to the other.  Singletary,

-26-

266 F.3d at 197; 6A Charles A. Wright, et al., Federal Practice & Procedure § 1499 (3d ed. 2010).

Here, although all defendants are represented by the same counsel, notice cannot be imputed through the shared attorney method.  Gayle has not offered any evidence that defendants' counsel established "communication or [a] relationship" with Ritter regarding the nature or pendency of the present action within 120 days of its commencement.  Singletary, 266 F.3d at 196; Garvin, 354 F.3d at 225-26; see also Smith v. City of Phila., 363 F. Supp. 2d 795, 800-01 & n.9 (E.D. Pa. 2005).

Gayle's sole argument that Ritter was constructively aware of the suit by virtue of shared representation is based on the fact that, at Gayle's December 15, 2009 deposition, defendants' counsel identified Ritter as the officer who sprayed Gayle with oleoresin capsicum on October 16, 2008.  Pl.'s Opp. at 15; DX D at 103-04.  In his original complaint, Gayle mistakenly averred that it was Miller who sprayed him.  According to Gayle, the Court may infer from counsel's identification that he or his firm was engaged in mutual representation of Ritter and the other defendants no later than the date of the deposition.  That may be so, though the Court need not decide the issue, because the deposition did not take place within the 120-day period relevant

to Rule 15(c).[12]  Gayle has not presented any other evidence as
to when defendants' counsel became aware of Ritter's
participation in the October 16 altercation, such that the Court
may infer that counsel earlier communicated with Ritter about his
potential liability for that incident.  Even though Ritter was
likely aware of the events giving rise to Gayle's lawsuit, based
on his personal involvement, that is not sufficient to establish
notice of the lawsuit for purposes of Rule 15(c).  Singletary,
266 F.3d at 195.

     Gayle further argues that notice should be imputed to
Ritter based on his identity of interests with Lamont and Miller,
as all three "work in the same part of the same small county
prison."  Pl.'s Opp. at 15.  The Court is unpersuaded by Gayle's
argument.  Third Circuit precedent holds that, absent actual
notice, "a non-management employee . . . does not share a
sufficient nexus of interests with his or her employer so that
notice given to the employer can be imputed to the employee for
Rule 15(c)[] purposes."  Singletary, 266 F.3d at 200, quoted in
Garvin, 354 F.3d at 227.  There is no reason to think that, as a
general matter, the "nexus of interests" between Lieutenant

---

     [12] As the defendants point out, during the December 2009
deposition, Gayle also became aware of Ritter's involvement in
the October 16 physical altercation, but then waited more than
two years to name Ritter as a defendant.  Def'ts' Br. at 10.  The
Supreme Court has made clear that the plaintiff's knowledge of a
mistake with respect to the naming of a defendant is immaterial
to whether the claims against that defendant, when added, relate
back to the original complaint.  Krupski, 130 S. Ct. at 2493-94.

Lamont and a subordinate correctional officer, such as Ritter, or between co-workers Miller and Ritter is any closer.

Finally, Gayle argues that any lack of notice is immaterial because Ritter has not presented evidence showing that he has been prejudiced by the untimeliness of the counts leveled against him.  The Third Circuit has noted, however, that notice and absence of prejudice are two separate elements of Rule 15(c)'s second prong, "each of which must be satisfied" for relation back to occur.  Urrutia v. Harrisburg Cnty. Police Dep't, 91 F.3d 451, 458 (3d Cir. 1996).  Because Gayle has not demonstrated that Ritter was timely notified of the action, Gayle's relation back argument fails, regardless of whether Ritter would be prejudiced by now having to defend against the claims listed in the SAC.  See Garvin, 354 F.3d at 222.

B.   Exhaustion of Administrative Remedies

The defendants argue that Gayle is precluded from bringing his remaining Eighth Amendment claims against Lamont and Miller due to his failure to exhaust available administrative remedies, in violation of the Prison Litigation Reform Act ("PLRA").  Def'ts' Br. at 19 (citing 42 U.S.C. § 1997e; Porter v. Nussle, 534 U.S. 516, 520 (2002)).  Pursuant to NCP policies, a prisoner must go through an internal grievance procedure before instituting an action in court.  Of relevance here, inmates are

first required to fill out a grievance slip, which can be obtained from NCP staff.  The completed grievance slip is then submitted to the appropriate official for a written response, and the grievance and response are placed in the inmate's permanent file.  DX N (Buskirk Aff.) ¶¶ 4, 7-8.

Defendants proffer an affidavit from NCP Warden Todd Buskirk who has reviewed Gayle's permanent file.  According to Buskirk's affidavit, the file contains numerous grievances; however, there are none relating to the October 16, 2008 altercation.  Additionally, although NCP issued a formal misconduct against Gayle for various prison code violations in connection with that incident, there is no appeal of the misconduct decision in Gayle's file.  Id. ¶¶ 36-39.  Defendants argue that the lack of any grievance in Gayle's file referencing the October 16 altercation or his subsequent lack of medical treatment demonstrates that none was ever filed and that the PLRA's exhaustion requirement has not been met.  Def'ts' Br. at 22.

Gayle raises genuine issues of material fact as to whether he exhausted administrative avenues of relief prior to bringing suit against Lamont and Miller.  At deposition, he testified that he submitted to NCP staff a grievance relating to the October 16, 2008 incident while recuperating in the medical unit.  According to Gayle, the grievance alleged that his

-30-

Rastafarianism played a role in sparking the altercation.  DX D at 102; PX B at 96.  Gayle fairly points out that he had no control over whether the grievance actually made its way into his permanent file once he handed it over to a correctional officer. The Court is not in a position to assess the weight to be credited to Gayle's testimony and cannot grant summary judgment in favor of the defendants on their exhaustion argument in view of this conflicting evidence.

      C.    <u>Eighth Amendment Claims Against Lamont and Miller</u>

The Eighth Amendment's prohibition against "cruel and unusual punishment" in the prison setting protects against "'the unnecessary and wanton infliction of pain.'"  <u>Fuentes v. Wagner</u>, 206 F.3d 335, 344 (3d Cir. 2000) (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986)).  Gayle alleges that the actions of Lamont and Miller rise to the level of "unnecessary and wanton infliction of pain" in two regards: (1) Lamont and Miller employed excessive force in subduing Gayle in his cell and (2) Lamont and Miller were deliberately indifferent to Gayle's medical needs in the days following that altercation.  Both of Gayle's Eighth Amendment claims raise genuine issues of material fact that prevent summary judgment in the defendants' favor.

1.   <u>Excessive Force</u>

The Eighth Amendment recognizes that some amount of force is often necessary in a prison.  Accordingly, the pivotal inquiry in an excessive force claim is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  <u>Hudson v. McMillian</u>, 503 U.S. 1, 6 (1992) (quotation marks and citations omitted).  In analyzing the constitutionality of force employed by prison officials, a court must focus on several factors, including the need for the application of force, the relationship between the need and the amount of force applied, the extent of the injury inflicted, and the extent of the threat to staff and inmate safety as reasonably perceived by responsible prison staff.  <u>Smith v. Mensinger</u>, 293 F.3d 641, 648-49 (3d Cir. 2002); <u>Brooks v. Kyler</u>, 204 F.3d 102, 106 (3d Cir. 2000).

The defendants do not dispute the substance of Gayle's excessive force claim.  Indeed, they concede that genuine issues of fact exist with respect to that allegation.  Def'ts' Br. at 17 n.5.  Rather, their challenge to the sufficiency of Gayle's claim is based solely on his failure to exhaust administrative remedies first.  Because the Court finds that summary judgment is not warranted as to the defendants' exhaustion argument, the Court will deny the defendants' motion for summary judgment on the

excessive force claim against Lamont and Miller.

    2.  <u>Inadequate Medical Care</u>

To succeed on an Eighth Amendment inadequate medical care claim, a plaintiff must demonstrate that (1) he suffered from "serious medical needs" and (2) the defendants acted or failed to act in a manner exhibiting deliberate indifference to those medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999).

    a.  <u>Serious Medical Need</u>

A medical condition constitutes a "serious medical need" where it "has been diagnosed by a physician as requiring treatment or . . . is so obvious that a lay person would easily recognize the necessity for a doctor's attention." <u>Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987) (quotation marks and citations omitted). The Third Circuit has also found that "[n]eedless suffering resulting from a denial of simple medical care" is sufficiently serious to state a claim under the Eighth Amendment. <u>Atkinson v. Taylor</u>, 316 F.3d 257, 266 (3d Cir. 2003).

The evidence in the summary judgment record is sufficient to raise genuine issues of material fact as to whether Gayle suffered a serious medical need. Gayle testified at

deposition that he remained on the floor of his cell from Thursday through Sunday evening because his back pain prevented him from standing or bathing.  DX D at 94-96.  That Sunday, October 19, Gayle was seen by prison medical personnel.  At that time, he was diagnosed as having "back pain secondary to trauma" and prescribed medications.  PX R.  Gayle remained in the medical unit for two weeks and was placed in a wheelchair.  DX D at 98. This evidence reasonably demonstrates the existence of a serious medical need on the basis of obvious medical necessity or a professional medical diagnosis.

>           b.   Deliberate Indifference

The "deliberate indifference" prong of an Eighth Amendment claim requires actions or omissions that would be deemed reckless under criminal law.  Nicini v. Morra, 212 F.3d 798, 811 (3d Cir. 2000) (en banc) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)).  The defendant must actually know of and disregard "an excessive risk to inmate health and safety." Farmer, 511 U.S. at 837.  Circumstantial evidence can demonstrate subjective knowledge if it shows that the excessive risk was so obvious the official must have known about it.  Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer, 511 U.S. at 842).  The Third Circuit has found deliberate indifference where the prison official, among other things,

(1) knew of a prisoner's need for medical treatment and intentionally refused to provide it; (2) delayed necessary medical treatment for a non-medical reason; or (3) prevented a prisoner from receiving needed or recommended medical treatment. Rouse, 182 F.3d at 197.

        The defendants appear to argue that Gayle cannot make out an inadequate medical care claim because he was ultimately seen by medical professionals and provided with treatment beginning on October 19.  As noted, utter failure to provide treatment is not a required element of an Eighth Amendment claim under the law of this circuit.  Delaying provision of needed medical attention may be found to violate the Constitution.  Id. (citing Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993); Monmouth Cnty. Corr. Institutional Inmates, 834 F.2d at 346-47). The fact that Gayle eventually received medical care does not foreclose recovery on his inadequate medical care claim.

        Gayle has proffered evidence demonstrating that both Lamont and Miller were aware of his back pain.  At deposition, Gayle testified that, when Lamont and Miller escorted him to the showers following the October 16 incident, he informed them that "they need[ed] to notify medical about [his] back."  DX D at 107. Later that day, Gayle repeatedly requested that Miller contact medical personnel on his behalf.  DX D at 95.  According to Gayle, Miller informed him that he had called the prison's

medical unit and also relayed Gayle's requests for medical attention to Lamont.  Id.  Miller himself acknowledged that he was aware of Gayle's asserted back pain.  He stated at his deposition that he made several phone calls to the medical team and notified his supervising lieutenant about Gayle's complaints of pain, although he could not recall whether the lieutenant with whom he spoke was Lieutenant Lamont.  DX I at 161-63.

   For his part, Lamont has testified that he was not informed at any point following the October 16 altercation that Gayle was requesting medical care.  DX F at 75.  Lamont claims that he did not learn that Gayle sought medical attention until he observed Gayle in the medical unit some days later.  Id. Whether Lamont or Gayle is correct as to Lamont's knowledge of Gayle's requests for treatment is an issue of fact to be determined at trial and cannot be decided by the Court at this stage.

   Gayle's evidence is also sufficient to show that Lamont deliberately ignored Gayle's medical needs.  When viewed in the light most favorable to Gayle, the evidentiary record reflects that Lamont knew of Gayle's requests for back treatment but did not procure the requested medical care, which appears to have been eventually needed.  According to Gayle's deposition testimony, Miller informed Gayle that Lamont, although aware on October 16 of Gayle's requests for medical treatment, refused to

see Gayle about that request.  DX D at 95.  Medical personnel did not attend to Gayle's back pain until the evening of Sunday, October 19, and there is no evidence to suggest that Lamont took part in the decision to send Gayle to the prison's medical staff for treatment.  Relevantly, Gayle claims that the nurse who took his blood pressure on October 16 examined him before he was moved to the showers and before he was aware of and notified Lamont, Miller, and Ritter about a potential back injury.  He alleges that the nurse was not called in response to his claim of back pain.

The inadequate medical treatment claim against Miller is somewhat closer.  Uncontroverted evidence in the record before the Court demonstrates that Miller informed both his supervising lieutenant and medical personnel on October 16 about Gayle's request for treatment.  In fact, Miller called the medical department more than once on October 16, although its staff did not request that Gayle be admitted to their unit.

According to Gayle's version of events, however, after Miller became aware that the prison's medical staff showed no signs of treating Gayle that day for back pain, Miller saw Gayle lying on the floor of his cell.  When Gayle repeated his request for medical attention, Miller responded by kicking the bars of the gate upon which Gayle was resting his head and stating that he would not again call the medical department for Gayle.  Id. at

-37-

100.  A reasonable factfinder could determine that these actions demonstrate deliberate indifference to Gayle's medical needs. See Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) (noting that, for a non-medical prison official to be charged with deliberate indifference under the Eighth Amendment, the official must be aware or have reason to know that medical staff are mistreating or failing to treat the prisoner).

III. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment is granted in part and denied in part.  An appropriate order will issue separately.